BERT L. BENNETT, JOE H. GLENN, JR., AND A. B. GLENN, TRADING AS QUALITY TRANSPORT COMPANY, v. SOUTHERN RAILWAY COMPANY; WINSTON-SALEM SOUTHBOUND RAILWAY COMPANY; ATLANTIC AND YADKIN RAILWAY COMPANY; ATLANTIC COAST LINE RAILROAD COMPANY; ABERDEEN AND ROCKFISH RAILROAD COMPANY; HIGH POINT, RANDLEMAN, ASHEBORO, AND SOUTHERN RAILROAD COMPANY; YADKIN RAILROAD COMPANY; AND PIEDMONT AND NORTHERN RAILWAY COMPANY.

(Filed 28 April, 1937.)

1. Pleadings § 15—

A demurrer on the ground that the complaint fails to state a cause of action will not be sustained unless the complaint is wholly insufficient.

2. Monopolies § 3—Individual may maintain action for damages caused by defendants' violation of statute against monopolies.

Plaintiffs, carriers by truck, instituted this action alleging that defendant railroad companies, pursuant to an agreement and conspiracy between them, had reduced rates for transporting gasoline and kerosene, between certain points in the State, intending later to restore them after competition had been removed, and charged lower rates to certain points in the State, where there was competition, than to other points, without sufficient reason, with intent to injure plaintiffs. Defendants demurred on the ground that the alleged acts were criminal offenses which could be inquired into only by prosecution by the Attorney-General. *Held:* The right of action for damages is expressly conferred by C. S., 2574, and defendants demurrer was properly overruled.

3. Same: Actions § 3—Damage sustained as result of defendants' violation of monopoly statute is not damnum absque injuria.

An individual suing for damages caused by alleged monopolistic acts of defendants, C. S., 2563, 2574, must show a casual relation between the

BENNETT *v.* R. R.

alleged violation of the monopoly statute and the injury, but where plaintiffs alleged unlawful acts in violation of the monopoly statute and injury resulting to them as a proximate cause of such acts, defendants' contention that the injury is *damnum absque injuria* is untenable. *Motor Service v. R. R.*, 210 N. C., 36, distinguished in that that action was for an injunction and based upon the Public Utilities Act, while this is an action for damages resulting from a violation of the statute against monopolies and trusts.    C. S., 2574.

**4. Carriers § 4—Carriers may not reduce rates when such reduction is made pursuant to agreement in violation of monopoly statute.**

The provisions of the monopoly statutes apply to railroads in the same manner as they apply to individuals and other corporations, and while C. S., 1112 (o), allows railroad companies to reduce rates at will and deprives the Utilities Commissioner of jurisdiction over reductions in rates, the statute applies to reductions in rates by railroad companies acting separately and with lawful intent, and does not permit railroad companies to violate the monopoly statutes by reducing rates in accordance with an agreement and conspiracy between them with intent to injure a competitor and thereafter to restore the rates, or to reduce rates to certain points where there is competition while maintaining higher rates to other points in the State without sufficient reason, with intent to injure a competitor, N. C. Code, 1112 (o), not being in conflict with the monopoly statutes.

CONNOR, J., concurring.

APPEAL by defendants from *Warlick, J.,* at June Term, 1936, of FORSYTH.    Affirmed.

This is an action instituted by a certain contract truck carrier engaged in the transportation of gasoline and kerosene in intrastate commerce from the terminal port at Wilmington, N. C., to certain points in North Carolina, against the defendant railroad companies, in which judgment is prayed as follows:

"(1) That they recover damages of the defendants on account of the injury done to them by reason of the acts and things herein set out; that the jury assess such damages in favor of the plaintiffs, and that judgment be entered against the defendants in treble the amount fixed by the verdict of the jury; (2) That the court issue an order restraining the· defendants from further reducing their rates for the transportation of gasoline and kerosene between said shipping points and any points in the State of North Carolina in intrastate commerce, and that they be ordered and directed by the court to cease and desist from carrying out in the future the illegal rates at present charged and maintained by them pursuant to such unlawful agreement and purpose, and that they be directed and ordered by the court to cease and desist from transporting gasoline and kerosene from said shipping points to any points in the State of North Carolina in intrastate commerce at rates less than were lawfully in force and effect prior to the unlawful conspiracy and acts herein com-

plained of; (3) And that the court grant to the plaintiffs such other relief as may be deemed just and proper."

Among other things, it is alleged in the complaint: "That the defendants illegally conspired and agreed among themselves to fix rates for the transportation of gasoline and kerosene in intrastate commerce in the State of North Carolina, and that all of the defendants should charge substantially the same rate for the transportation of such commodities, taking into consideration the distances and routes over which the commodities were to be hauled, and that the rates actually charged and collected by the defendants, pursuant to such agreement, have been uniform and had for one of their purposes the elimination of competition between themselves, and were also for the purpose of eliminating competition by motor truck haulers of such commodities, including the plaintiffs. That the defendants have unlawfully conspired, contracted, and agreed by express contract and agreement, or by contract and agreement knowingly implied, to do the following acts and things:

"(a) To willfully destroy and injure and to undertake to destroy and injure the business of the plaintiffs and other haulers of gasoline by motor trucks in the State of North Carolina with the purpose and intention of attempting to fix a price for the transportation of gasoline and kerosene within the State of North Carolina when the competition of the plaintiffs and other motor truck haulers of gasoline and kerosene is removed; that the service of transporting gasoline and kerosene is a thing of value; that the plaintiffs and defendants were and are business rivals in the transportation of gasoline in the State of North Carolina; that the defendants have unlawfully entered into an agreement and common purpose to reduce the rates for transporting gasoline and kerosene, as set out herein, for the purpose of destroying the business of the plaintiffs and other persons and corporations engaged in the business of transporting gasoline and kerosene by motor truck in intrastate commerce in the State of North Carolina, and with the further purpose of raising and fixing at a higher scale their rates for such transportation of said commodities after the removal of competition by the plaintiffs and other motor truck haulers of gasoline and kerosene.

"(b) That pursuant to the common purpose, agreement, and conspiracy referred to in the complaint, the defendants adopted the rates for the transportation of such commodities in intrastate commerce from Wilmington and River Terminal to designated points in the State of North Carolina, as set out in Exhibits, and have actually transported such commodities in intrastate commerce between said points at the reduced rates, thereby carrying out their plan and purpose of injuring the plaintiffs and other persons engaged in the business of transporting gasoline and kerosene in intrastate commerce in the State of North Carolina

BENNETT *v.* R. R.

in competition with the defendants, and they have damaged and injured these plaintiffs in the amounts hereinafter set out.

"(c) That the defendants who are engaged in transporting gasoline and kerosene for hire from River Terminal and Wilmington to various points through the entire territory of the State of North Carolina, which transportation is a thing of value, have, to the points designated in Exhibits, furnished such thing of value, to wit, the transportation of gasoline and kerosene between River Terminal and Wilmington to the points designated in said Exhibits, at a price lower than is charged by them to other places in the State of North Carolina, to wit, Asheville, Hendersonville, Murphy, and other points greater than a distance of approximately two hundred miles from Wilmington and Fayetteville respectively, and that there is not good and sufficient reason on account of transportation or the expense of doing business for charging less to the said places, to which the reduced rates have been put into effect, than to the other places in the State of North Carolina, and that such discrimination and charges, as herein set out, have been made with the view and purpose of injuring the business of the plaintiffs and of others engaged in the transportation by motor truck of gasoline and kerosene in intrastate commerce within the State of North Carolina.

"(d) That the plaintiffs are now engaged and were at all times referred to in this complaint engaged in the transportation by motor truck of gasoline and kerosene from Wilmington, North Carolina, to various points in the State of North Carolina, namely, Winston-Salem, Elkin, Mt. Airy, and Greenville, in competition with the defendants, and that the unlawful and illegal reduction of rates, as set out in the complaint, have greatly injured the plaintiffs.

"That in order to obtain any customers whatever who would employ the plaintiffs to transport gasoline and kerosene from Wilmington to any points in the State of North Carolina to which the reduced rates above specified were put into effect by the defendants, and in order for the plaintiffs to remain in business at all, and in order to avoid a total loss of all of plaintiffs' investment in motor trucks, tanks, and other equipment, it was made necessary by reason of the conduct of the defendants herein set out that the plaintiffs transport gasoline and kerosene from said shipping points to various termini in the State of North Carolina at substantially the same rates as were charged by the defendants; that the plaintiffs have, therefore, since the effective dates of the respective rate reductions, above set out, transported gasoline and kerosene at substantially the reduced rates over the routes, in the quantities and to the places set out in the attached Exhibit. That the loss in revenue resulting to the plaintiffs by reason of the enforced reduction of remuneration for transporting said commodities amounts to $14,854.91, and that

the plaintiffs have, therefore, by reason of the unlawful agreement, conspiracy, and acts of the defendants, herein set out, been actually damaged by reason of reduced revenues in the sum of $14,854.91."

Defendants filed demurrer to the complaint, as follows: "The defendants demur to the amendment to the complaint and to the complaint as amended, and state as grounds for their written demurrer:

"1. That the amendment and complaint as amended do not contain facts sufficient to constitute a cause of action in that:

"(1) The plaintiffs cannot recover damages based upon a violation of chapter 53 of the Code, sections 2559 to 2574, inclusive, entitled 'Monopolies and Trusts,' and upon an unlawful combination and conspiracy in violation of said chapter, where the act alleged to have been committed in furtherance of the conspiracy is a lawful act, the damage in such case, if any, being *damnum absque injuria.*

"(2) The act alleged in the complaint as having been committed in furtherance of the alleged conspiracy is a lawful act and has been declared by the Supreme Court of North Carolina in the case of *Carolina Motor Service, Inc., et al., v. Atlantic Coast Line Railroad Company, et al.,* 210 N. C., 36, to be a lawful act.

"(3) Plaintiffs allege that it is the purpose of defendants to increase the rates after the accomplishment of the purpose alleged in the complaint, and that the defendants can and will increase such rates, when as a matter of law, under the statutes of North Carolina, defendants cannot increase such rates or any freight rate without the approval of the Utilities Commissioner.

"(4) That the rates of which plaintiffs complain have been approved by the Utilities Commissioner as proper rates by formal order entered in the matter of Application of Southern Freight Association, Atlanta, Georgia, through Chairman J. E. Tilford, for Authority to Establish Truck Competitive Rates on Gasoline, including Blended Gasoline and Kerosene, from Wilmington, N. C., to North Carolina Points, Docket No. 446, which order is now in effect, and plaintiffs cannot complain of any damage resulting from the transportation of property at a proper rate by the defendants or any of them.

"(5) Chapter 53 of the Code, entitled 'Monopolies and Trusts,' has no application to a conspiracy or combination among carriers of freight by railroad to reduce freight rates.

"(6) It is not alleged in the complaint that any property or legal rights vested in the plaintiffs have been invaded or illegally interfered with by the promulgation and putting into effect of the rates referred to in the complaint.

"(7) Any alleged monopolistic acts on the part of the defendants, alleged in the complaint, of which the defendants may be guilty, are

criminal offenses and can only be inquired into in a proper action instituted under Chapter 53 of the Code, entitled 'Monopolies and Trusts,' by the Attorney-General of the State of North Carolina.

"2. That the court is without jurisdiction to hear and determine the cause of action, if any, set out in the complaint, for that:

"(1) An action under the provisions of Chapter 53 of the North Carolina Code, entitled 'Monopolies and Trusts,' with respect to the facts alleged in the complaint, can only be brought and maintained by the Attorney-General of the State of North Carolina.

"(2) Upon the facts alleged in the complaint, the court has no jurisdiction to determine the right of the plaintiffs to complain of the alleged acts of the defendants.

"Wherefore, these defendants pray that their demurrer be sustained."

The judgment of the court below is as follows: "This cause coming on to be heard and being heard in due course at the 22 June, 1936, Term of the Superior Court of Forsyth County before Wilson Warlick, Judge presiding, upon the demurrer filed by Southern Railway Company and others for misjoinder of parties and causes of action, and the plaintiffs, having prayed that the court allow an amendment to the complaint so as to make more clear the allegations of the complaint with reference to the matters referred to in the demurrer, the plaintiffs were allowed to file an amendment to the complaint, which amendment appears of record. All the defendants thereupon filed a written demurrer to the complaint as amended, said demurrer being based upon the ground that the complaint with the amendment does not state a cause of action. The court having heard arguments of counsel for plaintiffs and of counsel for defendants, and the court being of the opinion that the complaint is sufficient in law and does state a cause of action and that the said demurrer should be overruled; It is, therefore, ordered, adjudged, and decreed by the court that the demurrer of the defendants to the complaint on the ground that the same does not state a cause of action be and the same is hereby overruled. It is further ordered that said written demurrer be marked filed as of the date of the filing of the amended complaint. The judgment entered on Minute Docket 63, page 287, will be stricken out and this judgment entered in lieu thereof. Wilson Warlick, *Judge Presiding.*"

To the foregoing judgment, the defendants excepted, assigned error, and appealed to the Supreme Court.

*Parrish & Deal for plaintiffs.*
*Manly, Hendren & Womble for Southern Railway Co.*
*Craige & Craige for Winston-Salem Southbound Ry. Co.*
*Frank P. Hobgood for Atlantic &'Yadkin Ry. Co.*

*Richard B. Gwathmey and Murray Allen for Atlantic Coast Line Railroad Co.*

*Dye & Clark for Aberdeen & Rockfish Railroad Co.*

*Manly, Hendren & Womble for High Point, Randleman, Asheboro, and Southern Railroad Co.*

*Manly, Hendren & Womble for Yadkin Railroad Co.*

*W. S. O'B. Robinson, Jr., and Manly, Hendren & Womble for Piedmont & Northern Ry. Co.*

CLARKSON, J. On this record we are considering a demurrer. It is well settled that the complaint must be wholly insufficient before it can be overthrown by a demurrer. *Council v. Bank, ante,* 262 (265). In the present case we cannot so hold. Whether on the trial plaintiffs can sustain their allegations with competent proof is another matter.

The question involved: Was the court below correct in overruling defendants' general demurrer to the complaint, which alleged defendants, rail carriers, had unlawfully conspired to injure plaintiffs in violation of monopolies and trust statute, by (1) reducing rates for transporting gasoline and kerosene, intending later to restore them (C. S., 2563, par. 3), and (2) by charging lower rates to certain points in the State where there was competition, than to other points, without sufficient reason, with intent to injure plaintiffs (C. S., 2563, par. 5)? We think so.

N. C. Code, sec. 2559, is as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal. Every person or corporation who shall make any such contract expressly or shall knowingly be a party thereto by implication, or who shall engage in any such combination or conspiracy, shall be guilty of a misdemeanor, and upon conviction thereof such person shall be fined or imprisoned, or both, in the discretion of the court, whether such person entered into such contract individually or as an agent representing a corporation, and such corporation shall be fined in the discretion of the court not less than one thousand dollars." This section defines the offence and provides that indictment is one of the remedies.

The statute applicable in the present action is C. S., sec. 2563: "In addition to the matters and things hereinbefore declared to be illegal (sec. 2559), the following acts are declared to be unlawful, that is, for any person, firm, corporation, or association directly or indirectly to do or to have any contract, express or knowingly implied, to do any of the acts or things specified in any of the subsections of this section: . . .

(3) To willfully destroy or injure, or undertake to destroy or injure, the business of any opponent or business rival in the State of North Carolina with the purpose or intention of attempting to fix the price of any-

thing of value when the competition is removed. . . . (5) Who deals in any thing of value within the State of North Carolina, to give away or sell, at a place where there is competition, such thing of value at a price lower than is charged by such person, firm, corporation, or association for the same thing at another place, where there is not good and sufficient reason, on account of transportation or the expense of doing business, for charging less at the one place than at the other, with the view of injuring the business of another."

In *State v. Coal Co.,* 210 N. C., 742, the criminal attitude of the above section (2563 [3]) has been fully considered, and a jury verdict and judgment thereon sustained.

1. It is contended by the demurrer of defendants that the amendment and complaint as amended do not contain facts sufficient to constitute a cause of action (C. S., section 511 [6]), in that any alleged monopolist acts on the part of the defendants, alleged in the complaint, of which the defendants may be guilty, are criminal offenses and can only be inquired into in a proper action instituted under Chap. 53 of the Code, entitled "Monopolies and Trusts," by the Attorney-General of the State of North Carolina.

2. That the court is without jurisdiction to hear and determine the cause of action, if any, set out in the complaint, for that: (1) An action under the provisions of Chapter 53 of the North Carolina Code, entitled "Monopolies and Trusts," with respect to the facts alleged in the complaint, can only be brought and maintained by the Attorney-General of the State of North Carolina. (2) Upon the facts alleged in the complaint, the court has no jurisdiction to determine the right of the plaintiffs to complain of the alleged acts of the defendants.

The statute is contrary to defendants' contentions. Section 2574 is as follows: "If the business of any person, firm, or corporation shall be broken up, destroyed, or injured by reason of any act or thing done by any other person, firm, or corporation in violation of the provisions of this chapter, such person, firm, or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed by a jury in such case judgment shall be rendered in favor of plaintiff and against the defendant for treble the amount fixed by the verdict."

A casual relation between violation and injury must be shown. *Lewis v. Archbell,* 199 N. C., 205. See *Lewis v. Frye,* 207 N. C., 852; *Brown v. R. R.,* 208 N. C., 423; *Rice v. Ice Co.,* 204 N. C., 768.

Defendants contend (2) "The plaintiffs cannot recover damages based upon a violation of chapter 53 of the Code, sections 2559 to 2574, inclusive, entitled 'Monopolies and Trusts,' and upon an unlawful combination and conspiracy in violation of said chapter, where the act alleged

16—211

to have been committed in furtherance of the conspiracy is a lawful act, the damage in such case, if any, being *damnum absque injuria.* The act alleged in the complaint as having been committed in furtherance of the alleged conspiracy is a lawful act and has been declared by the Supreme Court of North Carolina in the case of *Carolina Motor Service, Inc., et al., v. Atlantic Coast Line Railroad Company, et al.,* 210 N. C., 36, to be a lawful act."

We think the present cast distinguishable from the *Carolina Motor Service, Inc., v. A. C. L. Ry. Co., supra.* That was an action (bill in equity) against certain railroads and the Utilities Commissioner of North Carolina, alleging (1) discrimination under the Public Utilities Act, and (2) incidentally a conspiracy to monopolize the transportation of gasoline, and the only relief prayed for was an injunction against the railroads and the Utilities Commissioner. The court held (1) that plaintiff failed to show any interest to be protected under the Public Utilities Act, and (2) that the alleged monopolistic acts of the defendants are criminal, and that equity will not enjoin the commission of a crime. The present case is not based on the Public Utilities Act to any extent whatever. It is an action at law for damages under the above statute, C. S., 2574. It is true the complaint also asks for a restraining order, but the record does not show that this phase of the case has been pressed. At the present time plaintiffs are relying on the damages phase of the case only. The first part of the opinion relates to the Public Utilities Act only and has no application to the present case. The remainder of the opinion relates to plaintiffs' prayer for an injunction, and the holding is that since the threatened wrong is a criminal act, equity does not restrain criminal acts, but leaves them to the criminal courts. The opinion, to some extent, supports the plaintiffs' contention that the alleged acts of the defendant carriers are unlawful and in violation of sec. 2563, quoting from the opinion: "While C. S., 2563, declares that all of the above-mentioned acts are unlawful, the following section, ·C. S., 2564," provides they are criminal. The same acts which sec. 2564 and the above opinion of the court declare criminal are by the express terms of sec. 2574 made the basis of a cause of action for treble damages by any person injured thereby, the defendants' demurrer admits that plaintiffs have been so damaged.

The provisions of the monopoly statutes apply to railroads just as they do to individuals and other corporations. Both at common law and under our monopoly statutes a conspiracy to reduce rates with intent to injure a competitor and thereafter to restore prices is actionable. Likewise a conspiracy to charge lower rates where there is competition, while maintaining higher rates to other points in the State for the same thing of value without sufficient reason, with intent to injure a competitor, is actionable. *State v. Atlantic Ice & Coal Co.,* 210 N. C., 742.

The rates fixed by defendants as the result of the alleged conspiracy are not legal rates, that is, they do not have the sanction of any administrative or judicial tribunal, either of the Utilities Commissioner or the courts, because the proviso to C. S., section 1112 (o), deprives the Utilities Commissioner of jurisdiction over reductions in rates. The proviso reads as follows: "Provided, however, that nothing herein shall be construed to prevent any public-service corporation from reducing its rates either directly or by change in classification." This means that any railroad acting lawfully, that is, individually and with proper intent, may reduce its own rates free of the control of the Utilities Commissioner, but it does not mean that it can, acting unlawfully or as a result of a conspiracy with other railroads, use this uncontrolled power to injure a competitor. It is conceded in defendants' brief that "Under the law of this State railroads may reduce their rates at will."

Further, Public Laws of 1933, N. C. Code, 1935 (Michie), sec. 1112(1) to (36) are not germane. The plaintiffs' complaint is bottomed on the provisions set forth in the Monopolies and Trusts Statutes, *supra.* The ending clause of the 1933 act, *supra,* sec. 27, is as follows: "No present provision of law shall be deemed to be repealed by this article except such as are directly in conflict therewith." In fact, sec. 1112(2) reads: "Every rate made, demanded, or received by any public utility or by any two or more public utilities jointly, shall be just and reasonable."

The plaintiffs' action for damages is under Chapter 53—Monopolies and Trusts. The rights of plaintiffs and the wrongs set forth in plaintiffs' complaint are founded on the statutory provisions therein set forth and are not in conflict with Chapter 307, Public Laws of 1933, *supra.* We think there is no conflict in the acts. *Horton v. Tel. Co.,* 202 N. C., 610.

This is a civil action alleging damage under the Monopolies and Trusts Statutes, *supra.* In the case of *State v. Atlantic Ice & Coal Co., supra* (748), which was a criminal action, speaking to the subject, this Court said: "In Fletcher's Cyc. Corporations (Permanent Ed.) Vol. 10, ch. 56, part of sec. 5016, p. 850, it is said: 'Ruinous competition by lowering prices has been recognized as an illegal medium of eliminating weaker competitors,' citing many authorities. *Porto Rican Amer. Tobacco Co. v. Amer. Tobacco Co.,* 30 Fed. Reporter, 234 (236); *Standard Oil Co. v. U. S.,* 221 U. S., 1; *U. S. v. Amer. Tobacco Co.,* 211 U. S., 106. Wharton's Criminal Law, Vol. 3, 12th Ed. (1932), sec. 2330, is as follows: 'In the closing years of the 19th Century and early part of the 20th, statutes were enacted in nearly all states and by Congress with a design to restrain the evils of complete monopoly. This class of laws has been sustained in principle as to both civil and criminal features. They

were leveled at contracts, combinations, and conspiracies in restraint of trade that had been declared to be against public policy and void under the common law before the passage of such new statutes. The language of the statutes need be supplemented by allegations as to the facts. Conspiracy to combine as well as the actual coöperation to monopolize is forbidden. The exaction of excessive prices upon the sale of necessaries was forbidden in the United States as in various countries during the World War. The criminal part of the act failed for indefiniteness.'" Constitution of N. C., Art. I, secs. 7 and 31; *S. v. Craft,* 168 N. C., 208; *Mar-Hof Co. v. Rosenbacker,* 176 N. C., 330; *Addyston Pipe and Steel Co. v. United States,* 175 U. S., 211, 85 Fed., 271, 44 L. Ed., 136, affirming the lower court. In the *Addyston case, supra, Judge Taft* said: "Upon this review of the law and the authorities, we can have no doubt that the association of the defendants, however reasonable the prices they fixed, however great the necessity for curbing themselves by joint agreement from committing financial suicide by ill-advised competition, was void at common law, because in restraint of trade, and tending to a monopoly. But the facts of the case do not require us to go so far as this, for they show that the attempted justification of this association on the grounds stated is without foundation." *U. S. v. Trans-Missouri Freight Association,* 166 U. S., 290, 41 L. Ed., 1007; *U. S. v. Joint Traffic Association,* 171 U. S., 505; *Northern Securities Co. v. U. S.,* 193 U. S., 197, 48 L. Ed., 679; *Tift v. Southern Railroad Co.,* 123 Fed., 789; *Keogh v. Chicago Northwestern Railroad Company,* 260 U. S., 156, 67 L. Ed., 183.

The defendants contend: (3) "Plaintiffs allege that it is the purpose of defendants to increase the rates after the accomplishment of the purpose alleged in the complaint, and that the defendants can and will increase such rates, when as a matter of law, under the statutes of North Carolina, defendants cannot increase such rates or any freight rate without the approval of the Utilities Commissioner. That the rates of which plaintiffs complain have been approved by the Utilities Commissioner as proper rates by formal order entered in the matter of Application of Southern Freight Association, Atlanta, Georgia, through Chairman J. E. Tilford, for Authority to Establish Truck Competitive Rates on Gasoline, including Blended Gasoline and Kerosene, from Wilmington, N. C., to North Carolina Points, Docket No. 446, which order is now in effect, and plaintiffs cannot complain of any damage resulting from the transportation of property at a proper rate by the defendants or any of them."

Section 1112 (o), is as follows: "The said Utilities Commissioner shall at all times be required to keep himself informed as to the public-service corporations hereinbefore specified and enumerated, their rates and

charges for service, and the service supplied to the citizens of the State and purposes therefor; and he shall at all times be empowered and required to inquire into such service and rates charged therefor, and to fix and determine as herein provided the reasonableness thereof, and upon petition or otherwise to make full inquiry into such rates and charges in behalf of the citizens of the State, and compel and require compliance with the regulations and charges, and final determination fixed therefor under the provisions of this article, and no corporation, association, partnership, or individual doing business in the State of North Carolina as a public-service corporation, or any corporation herein designated, shall be allowed to increase its rate and charge for service or change its classification in any manner whatsoever except upon petition duly filed with the Utilities Commission and inquiry held thereon and final determination of the reasonableness and necessity of any such increase change in classification or service: Provided, however, that nothing herein shall be construed to prevent any public-service corporation from reducing its rate either directly or by change in classification."

The complaint has an exhibit, in part, as follows: "Southern Freight Association, Atlanta, Georgia. 19 June, 1935. To the Utilities Commission of the State of North Carolina, Raleigh, N. C. J. E. Tilford, for and on behalf of all rail carriers operating in the State of North Carolina, hereby respectfully request authority to establish truck competitive rates on: 'Gasoline, including blended gasoline and kerosene, in tank cars, carloads, estimated weight 6.6 pounds per gallon, subject to Rule 35 of Southern Classification,' and routing shown in connection therewith, from Wilmington, N. C., to destinations in North Carolina, applicable on North Carolina intrastate traffic, and, for cause, states: *During the past several months the rail carriers have lost a very substantial proportion of this traffic to tank trucks.* After a series of conferences with the oil interests, these carriers *have determined* to establish reduced rates on both interstate and intrastate traffic in an effort to regain for future handling a part of the lost traffic and to prevent additional losses. Since the proposed rates are made to meet tank truck competition, they are not based strictly upon any mileage scale or any percentage relationship to first-class rates. *The new rates, of course, are lower in every case than the present rates; generally, they represent very substantial reductions,"* etc. (Italics ours.)

Under the proviso above set forth, this was unnecessary to be done, as the railroad carriers could reduce their rates at will. They have voluntarily put their heads into the "lion's jaw," it is no fault of plaintiffs. "These carriers have determined to establish reduced rates." No doubt by this unnecessary method, they thought that they could take advantage

of truck-carrier competitors. The Utilities Commissioners do not have the power to prevent any reduction proposed by the railways. The rates proposed by the railways go into effect whether the Utilities Commissioner approves them or not. Therefore, it cannot be said that the Commissioner has any jurisdiction whatever over reductions proposed by the railways, either to approve or disapprove. The defendant railways take the position in their brief that the Utilities Commissioner has no power to prevent them reducing rates as they please, and neither have the courts—that where rate reductions are concerned, they are answerable to no one, and that they can do whatever they please to destroy motor truck competition, conspire to reduce rates temporarily, conspire to charge unreasonably low rates where there is competition, then after they have injured or destroyed the business of plaintiffs and others, now contend that this is a lawful act, and to plaintiffs this is *damnum absque injuria.* We cannot so hold.

Under the proviso to sec. 1112 (o), the defendants can reduce their rates, but it does not follow that conspiracies in violation of the Monopolies and Trusts Statute are made legal by this proviso. The defendants say that a situation has been reached that they cannot raise their rates without the approval of the Commissioner, but whatever the situation in which the defendants find themselves, they created it, and created it by wrongfully taking advantage of the proviso to sec. 1112 (o) and conspiring to reduce rates to the injury of plaintiffs. The demurrer admits this. They admit that on their own responsibility they conspired to reduce the rates with the intent to injure plaintiffs, but they now say they are not responsible for having done so. The vice is the method— conspiracy—and the intent—injury of competitors. As was well said by *Judge Peckham* in the *Trans-Missouri Assn. case, supra,* what one company may do by way of charging reasonable rates is radically different from entering into a conspiracy with others to fix rates.

For the reasons given, the judgment of the court below is
Affirmed.

CONNOR, J., concurring. This action was heard in the Superior Court on defendants' demurrer to the complaint. The demurrer was overruled, and defendants appeal to this Court.

The only question presented by this appeal is whether the facts alleged in the complaint are sufficient to constitute a cause of action in which the plaintiffs are entitled to recover of the defendants. These facts are admitted by the demurrer. This Court is of opinion that the question presented should be answered in the affirmative. The judgment is accordingly affirmed. I concur in the judgment.